UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DIANE BILLUPS,

     Plaintiff,

v.                                    CASE NO. 8:06-cv-1433-T-23TGW

TAMPA SPORTS AUTHORITY,

     Defendant,

_____/

## **ORDER**

The plaintiff Diane Billups ("Billups") sues the defendant Tampa Sports Authority ("TSA") for violating her rights under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601-2654 (the "FMLA" or the "Act").  The defendant moves (Doc. 36) for summary judgment and the plaintiff (Doc. 63) responds in opposition.

## **FACTS**

TSA employed Billups from November, 1999, through March, 2006, as human resource director and (after her position was re-classified in October, 2005) human resource manager.  (Doc. 45 at 6-7 [21-26[1]]; Doc. 21 ¶ 10; Doc. 26 ¶ 10)  Billups was an

_____

[1]  Bracketed numbers refer to the internal page numbers of multi-page deposition transcripts.

at-will employee.  (Doc. 45 at 29-30 [115-118]; Doc. 38 at 33 [130]; Doc. 38-2 at 35 [295-96]; Doc. 41 at 41 [37-39])

In September, 2005, Doctor David Thiele ("Dr. Thiele") diagnosed Billups's depression and anxiety, prescribed the anti-depressant Lexapro, and composed a note for Billups's employer excusing Billups from work for two days.  (Doc. 57 at 13-14, 17-21)[2]  On October 7, 2005, Dr. Thiele found that Billups continued to suffer from depression and anxiety and additionally suffered from insomnia.  (Doc. 57 at 23)   On November 7, 2005, Dr. Thiele found that Billups's depression had improved but that her insomnia persisted, and he prescribed the sleep-aid Ambien.  (Doc. 57 at 26-28)   Dr. Thiele instructed Billups to return in eight to twelve weeks (or sooner if her condition worsened).  (Doc. 57 at 28)  On November 17, 2005, Billups faxed a United States Department of Labor ("DOL") Form WH-380 (the "FMLA certification") to Dr. Thiele, and Dr. Thiele signed the FMLA certification on November 30, 2005.  (Doc. 45 at 33 [131], 36 [141]; Doc. 57 at 33; Doc. 57-2)

On November 30, 2005, Billups called Dr. Thiele's office and scheduled an appointment for the next day.  (Doc. 45 at 35-36 [139-43], 39 [153-54])  Additionally, Billups left a voicemail for her supervisor Jeannette Baker ("Baker"), TSA's Director of Finance and Administration (Doc. 38 at 2 [8]; Doc. 21 ¶ 12; Doc. 26 ¶ 12), stating (a) that her doctor advised a few days' vacation, (b) that she would be absent from work on the

_____

[2]  Billups herself recalls (Doc. 45 at 31 [123-24]) that she first consulted Dr. Thiele about her depression in October, 2005.

following day owing to a doctor's appointment, and (c) that she would obtain the necessary FMLA paperwork from her doctor.  (Doc. 36-3 nos. 7- 8; Doc. 38-2 at 21-24 [237-238, 242, 245, 250]; Doc. 45-10; Doc. 46-18)  Baker understood from the voicemail that Billups suffered a medical problem and expected that she would need FMLA-protected leave.[3]

On December 1, 2005, Billups told Baker that Billups needed FMLA leave and that she would obtain her FMLA certification at her doctor's appointment that afternoon. (Doc. 36-3 nos. 7- 8; Doc. 45-10; cf. Doc. 38-2 at 31 [279])  At the appointment, Dr. Thiele's nurse practitioner doubled Billups's Lexapro dosage.  (Doc. 57 at 28-29; Doc. 45 at 32 [127-128])

On December 2, 2005, Billups formally requested intermittent FMLA leave and submitted the completed FMLA certification to Baker.  (Doc. 45-7 at 6; Doc. 45-8; Doc. 46-13; Doc. 36-3 nos. 7-8; Doc. 38-2 at 14 [209-210]; Doc. 21 ¶ 15-17; Doc. 26 ¶ 15-17) The FMLA certification (Doc. 57-2, Doc. 46-13) states that:

- Billups suffered from depression with anxiety, including "episodes of anxiety so severe that temporary disability results, despite ongoing prescription medication."

---

[3]  Baker denies that Billups either expressly mentioned an FMLA-qualifying medical event or expressly informed Baker of her need for FMLA leave.  (Doc. 38-2 at 21-22 [237-38, 242]; cf. Doc. 46-18; Doc. 21 ¶¶ 14, 24; Doc. 26 ¶¶ 14, 24)  However, Baker admits that she understood from Billups's voicemail that Billups expected to tell her, "'I'm going to need to take some FMLA.'"  (Doc. 38-2 at 21 [238])  See also Doc. 38-2 at 22 [244] ("I thought she was going to come in and say to me, 'Look, I've got something going on here, and I think I am going to go on FMLA.  I'm notifying you that I'm going to have this processed.'")

- Billups's medical condition qualified as a category four "serious health condition," that is, a chronic condition that requires periodic visits for treatment by a health care provider, continues over an extended period of time "including recurring episodes of a single underlying condition," and "[m]ay cause episodic rather than a continuing period of incapacity . . . ."

- Billups's condition began approximately in August, 2005, and would probably last for the next twelve months at least.  Billups had "no current disability."

- During the next twelve months, Billups would need to be absent from work intermittently–"during episodes of incapacity" that would likely occur zero to four times per month and last for one to five days.

- Billups would need medical leave for absences from work and would be "unable to perform work of any kind during [her] episodes of incapacity."

As far as Dr. Thiele knew, Billups "wasn't currently incapacitated at the writing of that FMLA form."  (Doc. 57 at 31)  Dr. Thiele predicted neither whether Billups would suffer a disabling episode nor, if so, how many episodes Billups would suffer; rather, he opined in the certification that the severity of Billups's symptoms suggested up to four episodes per month, each episode lasting one to five days and requiring leave from work.  (Doc. 57 at 32-33, 38, 42-44, 49-50)

Billups states that, when she formally requested FMLA leave, Baker commented, "you do not look sick."  (Doc. 36-3 nos. 8, 10)  Baker told Billups that she would examine the paperwork and respond later (Doc. 38-2 at 10 [194], 14 [211], 31 [280], 34 [289-90]; Doc. 21 ¶ 15-17, Doc. 26 ¶ 15-17)  Baker claims that, because she did not normally

- 4 -

handle FMLA requests, she examined the relevant DOL regulations and consulted others, including Dara Chenevert ("Chenevert"), an attorney in the Hillsborough County Board of County Commissioners' human resources department.  (Doc. 38 at 13-14 [49-54]; Doc. 38-2 at 17 [224])  However, Chenevert recalls that, although she conversed with Baker about Billups in January or February, 2006, Baker did not mention Billups's request for FMLA leave, and Chenevert denies having knowledge of Billups's FMLA request before her deposition in this lawsuit.  (Doc. 68 at 5-6, 8-9, 15)  As Chenevert recalls the conversation, Baker consulted Chenevert about beginning an investigation into Billups's inappropriate workplace comments, which discomforted other employees.  (Doc. 68 at 5-8)

On December 9, 2005, Baker informed Billups that her request for intermittent FMLA leave was "approved" but that she would not receive FMLA leave before January 2, 2006.  (Doc. 38-2 at 14 [211]; Doc. 46-16; Doc. 36-3 nos. 7-8; Doc. 38-2 at 24-25 [252-53]; Doc. 45 at 48 [192], 51 [203]; Doc. 21 ¶¶ 15-17; Doc. 26 ¶¶ 15-17)  Although Baker accepted that Billups's "serious health condition" entitled her to FMLA leave (Doc. 38 at 12-14 [47, 52, 54]; Doc. 38-2 at 18 [225]), Baker believed that, because (a) Billups's need for FMLA leave was foreseeable and (b) Billups had "no current disability," TSA was entitled to thirty days' notice before Billups's FMLA leave.  (Doc. 38 at 11-12 [43-47])  Baker states that TSA chose to exercise this right "because [Billups] was in a one-deep position" (Doc. 38 at 12-14 [47, 53, 54]; see also Doc. 38-2 at 11-12 [199-201])–one example of which is that TSA needed Billups to train others to process workers'

- 5 -

compensation claims (Doc. 38 at 12 [47-48])–and because Chenevert told Baker (Doc. 38-2 at 17 [223]) that requiring thirty days' notice was appropriate in the circumstances. Accordingly, after obtaining the approval of TSA's Executive Director, Henry Saavedra ("Saavedra") (Doc. 41 at 32 [126-27], 35 [140]), Baker informed Billups that her FMLA leave was approved to begin on January 2, 2006.

Billups, who normally handled FMLA matters herself (Doc. 38 at 13 [50], Doc. 45 at 33-34 [132-33]; Doc. 41 at 29 [114]), questioned the thirty-day notice requirement and requested a written explanation.  In a December 9, 2005, letter approved by Saavedra (Doc. 41 at 35-36 [140-43]), Baker summarized the basis for her decision.  Additionally, Baker informed Billups that TSA required Billups to complete several tasks (for example, training other employees to perform some of her duties) before her FMLA leave.  (Doc. 46-12; Doc. 36-3 no. 8; Doc. 38-2 at 11 [199-200])  Finally, Baker informed Billups that (1) Billups was eligible for FMLA leave and (2) TSA would require Billups to furnish both a re-certification of her "serious health condition" every thirty days and a fitness-for-duty certificate after her twelve weeks of FMLA leave.  (Doc. 46-12)

In a December 13, 2005, email (Doc. 46-17), Billups again complained to Baker about the thirty-day notice requirement.  Billups and Baker argued about the requirement at a meeting in Baker's office on the afternoon of December 15, 2005.  Baker states that Billups yelled at her for thirty to forty-five minutes, that after the meeting Baker prepared a formal letter of reprimand (Doc. 46-20) recording Billups's insubordination but did not deliver the letter because Saavedra instructed her to verbally counsel Billups instead, and

that Baker accordingly told Billups that further outbursts would result in disciplinary action. (Doc. 38 at 11-15 [43-44, 48-49, 55-57], 21 [82-84]; Doc. 38-2 at 24-26 [252, 256-60]; Doc. 21 ¶ 27, Doc. 26 ¶ 27; see also Doc. 41 at 24-25).  Saavedra confirms that, on a day shortly before December 16, he heard Billups yelling at Baker and that after reading Baker's written reprimand he instructed Baker instead to verbally counsel Billups (Doc. 41 at 6-7 [24-25],  33-34 [132-36])  On the other hand, Billups admits her loud voice but denies yelling at Baker.  Billups claims that Baker (1) insinuated that Billups did not need medical leave (she "look[ed] great"), (2) said that Billups was "unreliable due to [her] FMLA request," and (3) required Billups to perform extraordinary work on short notice. (Doc. 36-3 nos. 8, 10; Doc. 45 at 46 [181-82]; cf. Doc. 40 at 11 [42])

In a December 16, 2005, letter (Doc. 46-19), Baker again told Billups that, because Billups had been in treatment for her condition since August, 2005, and because her FMLA certification stated that she had "no current disability," TSA was entitled to require thirty days' notice and Billups's FMLA leave was therefore approved to begin on January 2, 2006.  However, Baker added that "should your health care provider advise [TSA] that your condition requires that the FMLA is of such an emergen[cy] nature that it should begin without reasonable notice, [TSA] will accommodate that need."  (Doc. 46-19; see also Doc. 38 at 12 [46], Doc. 32-2 at [195])  Additionally, Baker repeated that Billups needed to complete several tasks before her FMLA leave, and she stated that Billups's FMLA leave could begin once the staff became confident that they could "minimally carry out basic HR functions" in her absence.  (Doc. 46-19)

Billups continued to object to the notice requirement.  (Doc. 36-3 no. 8)  Billups requested a designation of her December 14, 2005, leave as FMLA leave, and she requested FMLA leave for December 20, 2006.  (Doc. 45-7 at 4-5; Doc. 36-3 no. 7)  Baker denied both requests and designated Billups's December, 2006, leave as non-FMLA sick leave.  (Doc. 36-3 no. 7; Doc. 38-2 at 10-11 [194-97], 32 [282-83]; Doc. 45-7 at 4-5)  Baker told Billups that "she would not be prevented from taking any [sick] leave whatsoever" (Doc. 38 at 12 [47]; see also 15 [57-58]; Doc. 38-2 at 10 [194-95], 17 [222], 32 [283]; Doc. 46-17; Doc. 36-3 no. 8), and Billups admits receiving the sick leave she requested.  (Doc. 45 at 37 [145-46]; cf. Doc. 38-2 at 18 [228], 23-24 [246, 250])

Billups claims that on December 20, 2005, she again tried to explain to Baker that Dr. Thiele certified that she needed FMLA leave immediately, not in January, and that she was entitled to receive FMLA leave immediately.  Baker replied that Billups misinterpreted the FMLA, but Baker added that Billups "could have all of the leave [she] wanted, but just not FMLA leave."  (Doc. 36-3 no. 8)

On Friday, December 30, 2005, Billups requested FMLA leave for January 25, 2006, and Baker approved the request.  (Doc. 45-7 at 2; Doc. 21 ¶ 28; Doc. 26 ¶ 28)  On the same day, Billups received in the mail either her first notice or the last in a series of notices–the undisputed facts do not establish which–from Hartford Life Insurance Company ("Hartford") that by Saturday, December 31, 2005, TSA needed to adopt an amendment (the "amendment") to TSA's Internal Revenue Code Section 457 deferred compensation plan (the "457 plan").  Billups e-mailed the amendment to Baker late in the

- 8 -

afternoon and informed Baker of the deadline.  (Doc. 45-9; Doc. 70-3)  Responding a few

minutes later, Baker (1) expressed her annoyance that Billups, who was the 457 plan

administrator or sponsor for TSA (Doc. 37-2; Doc. 38 at 11 [42], 16 [63], 19-20 [74, 76,

78]; cf. Doc. 45-2), had left for the weekend without discussing the matter with Baker, (2)

told Billups that because Billups had failed to update an authorization form, neither Baker,

Saavedra, nor Mickey Farrell (TSA's Director of Stadium Operations) could execute the

amendment, (3) stated that TSA's failure timely to execute the amendment would render

TSA's 457 plan non-compliant with Internal Revenue Code Section 457(b) and expose

plan participants to unfavorable tax consequences, and (4) directed Billups to come to

work on Saturday, December 31, 2005, to review and execute the amendment.  (Doc. 37-

3; Doc. 70-3; Doc. 38 at 20 [77-80]; see also Doc. 45 at 12 [45]; Doc. 21 ¶ 29; Doc. 26 ¶

29)  Although Billups complained that she was not the proper signatory (Doc. 38-2 at 20

[77-78]; Doc. 45 at 12 [45]), Billups complied.  (Doc. 70-3; Doc. 45 at 12-13 [48-49])

On January 18, 2006, Baker summoned Billups to her office and repeatedly

asked her to explain why she had not executed the amendment before December 30,

2005.  (Doc. 45 at 53 [209]; Doc. 38 at 15-17 [60-67]).  Billups maintained that she did not

receive the amendment from Hartford until December 30, 2005, and that she had no

earlier notice of TSA's need to execute the amendment.  (Doc. 45 at 53 [209]; Doc. 38 at

16 [61-62])  Baker disbelieved and rejected this explanation.  (Doc. 38 at 16-17 [61, 66-

67]; Doc. 45 at 53 [209]; see also Doc. 63-2)  Baker claims that Billups refused to provide

any other explanation.  Instead, Baker claims that Billups yelled at Baker for somewhere

- 9 -

between forty-five and ninety minutes.  (Doc. 38 at 15-17 [60-61, 66-67])  Billups on the other hand maintains that after accusing Billups of "dropping the ball" on the 457 plan amendments and rejecting Billups's explanation, Baker warned Billups that if she did not start learning her job and cooperating with co-workers, she would not be around much longer.  (Doc. 45 at 53 [209-212])

On January, 25, 2006, Billups requested FMLA leave for February 10, 2006, and Baker approved the request.  (Doc. 21 ¶ 33; Doc. 26 ¶ 33; Doc. 45-7 at 1)  Also on January 25, 2006, Billups began seeing psychiatrist Dr. Kathleen Carroll, who prescribed an additional anti-anxiety medication and a sleep aid.  On January 30, 2006, Billups submitted to TSA a re-certification by Dr. Carroll of Billups's need for intermittent FMLA leave.  (Doc. 21 ¶ 35; Doc. 26 ¶ 35)  Dr. Carroll's FMLA re-certification (Doc. 45-8 at 9-11) is similar to Dr. Thiele's November 30, 2005, FMLA certification.

On February 15, 2006, Baker informed Billups that, with the concurrence of Saavedra and Farrell, Baker had "decided to make a change to [her] Accounting and Administration team" and that Billups was terminated effective March 1, 2006, and on paid administrative leave effective immediately.  (Doc. 63-5; see also Doc. 21 ¶ 36; Doc. 26 ¶ 36; Doc. 38 at 31 [121])  Robert Van Norman ("Van Norman"), an employee of the background investigations unit of the Manatee County Sheriff's professional standards office, spoke with Baker on March 28, 2006, in the course of a background investigation of Billups.  According to Van Norman's notes of the conversation (Doc. 66), Baker stated that Billups left TSA because her job was "[d]owngraded . . . as part of [a] reorganization.

Nothing to do with app[licant]."  Baker added that Billups "was an excellent employee/manager.  You will get a great person if you hire her.  Outstanding in all ways."

## **DISCUSSION**

Summary judgment results only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c), Federal Rules of Civil Procedure; see also Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986).  "There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). The evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof.  Celotex Corp., 477 U.S. at 323.

The FMLA grants an eligible employee the right to "'12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee,' 29 U.S.C. § 2612(a)(1), and the right following leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an equivalent position, 29 U.S.C. § 2614(a)(1)."  Strickland v. Water Works and Sewer Bd. of City of

Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001).  A "serious health condition" is one that involves either inpatient treatment in a hospital or continuing treatment by a health care provider.  29 U.S.C. § 2611(11).  A chronic illness, causing only episodic incapacity, may constitute a "serious health condition," 29 C.F.R. § 825.114(a)(2)(iii)(C), and FMLA leave "may be taken intermittently or on a reduced leave schedule when medically necessary."  29 U.S.C. § 2612(b); see also 29 C.F.R. § 825.203.

The Act imposes on the employee notice requirements that vary according as the need for the leave is foreseeable or unforeseeable.  If the employee's need for FMLA leave is foreseeable, the employee generally must provide the employer with thirty days' notice.  29 U.S.C. § 2612(e)(2)(b).  However, "[i]f, though the leave is foreseeable, '30 days notice is not practicable, such as because of a lack of knowledge of approximately when the leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable,'" Cruz v. Publix Super Markets, Inc., 428 F.3d 1379, 1382 (11th Cir. 2005) (quoting 29 C.F.R. § 825.302(a)), which ordinarily means "within one or two business days of when the need for leave becomes known to the employee."  29 C.F.R. § 825.302(b).  The employee need not expressly assert a right under the FMLA or even mention the FMLA.  29 C.F.R. § 825.302(c).  "However, the notice must be 'sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.'"  Cruz, 428 F.3d at 1383 (quoting 29 C.F.R. § 825.302(c)).  If the employer needs more

information to determine whether the employee is requesting FMLA leave, the employer should ask.  29 C.F.R. § 825.302(c).

If the approximate timing of the need for FMLA leave is not foreseeable, an employee should notify the employer as soon as practicable, 29 C.F.R. § 825.303(a), which ordinarily means "within no more than one or two working days of learning of the need for leave." 29 C.F.R. § 825.303(a).  The employee need not expressly assert a right under the FMLA or even mention the FMLA.  29 C.F.R. § 825.303(b).  "[T]he employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason."  Gay v. Gilman Paper Co., 125 F.3d 1432, 1436 (11th Cir. 1997).  If the employee complies, the employer must ascertain whether the employee's absence qualifies for FMLA protection. Strickland, 239 F.3d at 1209 (citing 29 C.F.R. § 825.303(b)).

## I.  The Interference Claim (Count One)

The FMLA creates both "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, see 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, see 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c)."  Strickland, 239 F.3d at 1206.

The Act forbids an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under the FMLA, 29 U.S.C. § 2615(a).  The

implementing regulations (1) state that any violation of the implementing regulations[4] constitutes interfering with, restraining, or denying the exercise of rights provided by the Act and (2) list, as examples of such interference, "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).

To prove prohibited interference, a plaintiff must demonstrate entitlement to and denial of a benefit under the Act.  Strickland, 239 F.3d at 1208.  The plaintiff need not prove his employer's intent or motive; "the employer's motives are irrelevant" to an interference claim.  Strickland, 239 F.3d at 1208.  However, "even where there may have been technical violations of the FMLA, those violations are not compensable where . . . a plaintiff has failed to demonstrate that he suffered any 'adverse employment action.'" Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1275 (11th Cir. 1999) ("[A] plaintiff suffers no FMLA injury when she receives all the leave she requests, and indeed is paid for most of it."); cf. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 82 (2002) ("[29 U.S.C.] § 2617 provides no relief unless the employee has been prejudiced by the [employer's] violation.").

TSA concedes that Billups was an eligible employee under the FMLA and the undisputed facts demonstrate that TSA required Billups to wait thirty days before the

---

[4]  But see Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (U.S. 2002) (invalidating in part 29 C.F.R. § 825.700(a)); Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791 (11th Cir. 2000) (invalidating in part 29 C.F.R. § 825.110(d))).

intermittent FMLA leave she requested on December 2, 2005.  However, TSA contends that (1) even if Billups was entitled to FMLA leave when she submitted her request for intermittent FMLA leave on December 2, 2005, TSA was entitled to require thirty days' notice because Billups's need for FMLA leave was foreseeable, and (2) Billups suffered no injury from the postponement of her FMLA leave.

The Act states that an FMLA certification from a health care provider "shall be sufficient" if it states the date on which the condition commenced, its probable duration, appropriate medical facts within the knowledge of the health care provider regarding the condition, and (in the case of intermittent leave for the employee's own "serious health condition") a statement of the medical necessity for the intermittent leave and a statement that "the employee is unable to perform the functions of the position of the employee."  29 U.S.C. § 2613(b).  Form WH-380, designed to elicit this information,[5] poses a series a questions that track the Act and the implementing regulations.[6]  Dr. Thiele's completed form WH-380 provides the required information.  In particular, Dr. Thiele certifies (Doc. 46-13) that Billups's "serious medical condition" results in episodes of incapacity that

---

[5]  See 29 C.F.R. Pt. 825, App. B; 29 C.F.R. § 825.306(a) (noting that the DOL "has developed an optional form (Form WH 380, as revised) for employees' . . . use in obtaining medical certification from health care providers that meets FMLA certification requirements. . . .  This optional form reflects certification requirements so as to permit the health care provider to furnish appropriate medical information within his or her knowledge").

[6]  See Hoffman v. Prof'l Med. Team, 394 F.3d 414, 416 (6th Cir. 2005) (noting that Form WH-380, with an exception not relevant here, "tracks the language of the statute and implementing regulations").

render her "unable to perform work of any kind."  Although an employer with reason to doubt the validity of an FMLA certification may require an opinion by a second health care provider at the employer's expense, 29 U.S.C. § 2613(c), and although an employer must permit the employee an opprtunity to cure a deficient certification, 29 C.F.R. § 825.305(d), TSA doubted neither the validity nor the completeness of Dr. Thiele's certification.  On the contrary, Baker believed that Dr. Thiele's certification demonstrated Billups's entitlement to FMLA leave.  (Doc. 38 at 12-14 [47-54]; Doc. 38-2 at 18 [225])[7] Dr. Carroll's January, 2006, re-certification of Billups's condition supports Dr. Thiele's certification, and TSA presents no opposing medical evidence.

Dr. Thiele certified that Billups suffered "episodes of anxiety so severe that temporary disability results" and that Billups consequently required leave as frequently as four times per month, each episode persisting from one to five days.  Accordingly, Billups requested approval for intermittent FMLA leave.  Whether Billups was incapacitated either when Dr. Thiele signed the FMLA certification or when Billups formally requested intermittent FMLA leave influences her entitlement to FMLA leave on those days but not the adequacy of Dr. Thiele's certification of her need for intermittent FMLA leave during her incapacity.  The FMLA requires no medically certified prediction of the moment of incapacitation, an impossible prediction.  (Doc. 57 at 32-33, 38, 42-44, 49-50; see also

---

[7] See also 46-12. In this DOL Form WH-381, "Employer Response to Employee Request for Family or Medical Leave," after the words "[Y]ou must furnish a [medical] certification by," Baker inserted the words "N/A – provided."

Doc. 56 at 17, 30, 38)  Nor was Billups required to obtain an unending series of certifications, another due upon each recurrence of incapacity.  Accordingly, assuming the satisfaction of the other statutory prerequisites, the FMLA entitled Billups to intermittent FMLA leave upon an episode of incapacity during December, 2005.

The parties dispute when and even whether Billups's need for FMLA leave became foreseeable.  However, viewed most favorably to Billups, some evidence tends to show that Billups could not foresee that she would need intermittent FMLA leave before November 17, 2005.  Although suffering symptoms of depression since August, 2005, Billups states that she consulted Dr. Thiele about her worsening depression in October, 2005.[8]  (Doc. 45 at 31 [124])  Dr. Thiele states that on November 7, 2005, Billups's depression had improved, and he instructed her to return in eight to twelve weeks (or sooner if her condition worsened).  (Doc. 57 at 28)  On November 17, 2005, Bilups sent Dr. Thiele the FMLA certification because, as she explains, "I felt that my condition was deteriorating rapidly, I was not getting better, and that I needed to make sure that my time away, whether it was my taking leave or . . . that I needed the protection [of] the Family Medical Leave [Act]."  (Doc. 45 at 33 [131-32]; see also Doc. 45 at 35 [139], 39 [154])  Billups explains that she did not submit an FMLA certification earlier "[b]ecause I thought it was just going to be very temporary and that I was going to be able to get it pulled all together to continue on my job."  (Doc. 45 at 35 [138])  Asked

---

[8]  Dr. Thiele placed this consultation in September, 2005.  (Doc. 57 at 13-14, 17-21)

when she first could foresee her need for leave, Billups replied (before denying

categorically the foreseeability of her need for FMLA leave), "When I was not getting

better [at] the end of November."  (Doc. 45 at 34 [135]) Billups's testimony presents a

genuine issue about when she could foresee her need for FMLA leave.

Not later than November 17, 2005, Billups's need for intermittent FMLA leave was

manifest.  However, "[i]f thirty days notice is not practicable, such as because of a lack of

knowledge of approximately when the leave will be required to begin," the Act requires

the employee to notify the employer as soon as practicable, ordinarily "within one or two

business days."  29 C.F.R. § 825.302(b).  Genuine issues of fact exist as to (1) whether

before November 30, 2005, (the day on which she suffered a severe anxiety attack, Doc.

45 at 35 [139-40], 39 [154], scheduled an appointment to see her doctor the next day,

and informed Baker that she expected to need FMLA leave) Billups knew approximately

when she would need to begin her intermittent FMLA leave, and (2) whether Billups

notified TSA as soon as practicable in the circumstances on December 2, 2005–just two

days later.  Viewed in the light most favorable to Billups, the record contains evidence

that tends to show that Billups notified TSA as required by the Act.

However, even if TSA interfered with her right to FMLA leave in December, 2005,

Billups presents no evidence of either adverse employment action or a cognizable injury

from that interference.  Billups admits she received the paid sick leave she requested in

December, 2005.  Billups's receipt of all requested sick leave and all compensation owed

defeats her interference claim because "a plaintiff suffers no FMLA injury when she

receives all the leave she requests, and indeed is paid for . . . it." Graham, 193 F.3d at

1275; see also Drago, 453 F.3d at 1307.

Billups attempts to evade Graham's rule.  First, Billups erroneously contends that

the rule applies to an FMLA retaliation claim, but not to an FMLA interference claim.  In

fact, the rule applies to both.  For example, Drago v. Jenne, 453 F.3d 1301, 1307 (11th

Cir. 2006), affirms a summary judgment on an FMLA interference claim because the

employer "paid [the plaintiff] for all the leave he took" and the plaintiff  "offer[ed] no

evidence that he suffered any damage as a result of [the employer's] requirement that he

take . . . two days' paid leave."

Second, Billups argues that she is entitled to emotional distress damages,

nominal damages, and equitable relief.  However, the FMLA provides for neither

emotional distress damages nor nominal damages,[9] and equitable relief is not appropriate

in the absence of an FMLA injury.  Rodgers v. City of Des Moines, 435 F.3d 904, 909 (8th

_____

[9]    Graham, 193 F.3d at 1284 ("[T]he FMLA does not allow recovery for mental
distress or the loss of job security."); Walker v. United Parcel Serv., Inc., 240 F.3d 1268,
1270 (10th Cir. 2001) ("nominal damages are not available under the FMLA"); Colburn
v. Parker Hannifin/Nichols Portland Div., 355 F. Supp. 2d 566, 568 (D. Me. 2005) ("no
nominal or consequential damages are available" under the FMLA); Gibson v. Lafayette
Manor, Inc., 2007 WL 951473, *22 (W.D. Pa.) (2007) ("nominal damages are not an
available remedy under the FMLA"); Oby v. Baton Rouge Marriott, 329 F. Supp. 2d 772,
788 (M.D. La. 2004) ("nominal damages are not available under the FMLA . . . ."); 
Coleman v. Potomac Elec. Power Co., 281 F. Supp. 2d 250, 254 (D.D.C. 2003)
("nominal damages, or damages for emotional distress-are not recoverable" under the
FMLA).  But see McDonnell v. Miller Oil Co., 134 F.3d 638 (4th Cir. 1998) (holding that
attorneys' fees were available under FMLA where jury awarded only nominal damages).

- 19 -

Cir. 2006) ("Because [the plaintiff] suffered no prejudice, the FMLA provides no equitable relief") (citing Ragsdale, 535 U.S. at 89).

Third, Billups contends that TSA's interference with her right to FMLA leave caused her $243.59 in medical expense (the cost of prescriptions, medical appointments, and associated mileage expense) recoverable as "actual monetary losses [she] sustained . . . as a direct result of the [FMLA] violation." 29 U.S.C. § 2617(a).  To prove the expense, Billups relies on a belated amendment to her answers to the defendant's interrogatories.  (Doc. 63-3)  To prove causation, Billups relies on testimony that because sick leave, unlike FMLA leave, is not "protected" (that is, because an employee absent on sick leave, unlike an employee absent on FMLA leave, lacks entitlement to restoration of the antecedent job or an equivalent job upon resuming work) Billups feared termination during sick leave and occasionally worked in December, 2005, despite severe depression.  (Doc. 45 at 47-48 [187-89]; see also Doc. 56 at 33, 35, 40)  Although unable to specify the days on which this happened, Billups insists that her working despite severe depression occurred "multiple times" and "day after day."  (Doc. Doc. 45 at 47 [187-88])  Additionally, Billups states that Baker's hostile response to her FMLA requests–for example, Baker's telling Billups, "do not cry"–exacerbated her depression and anxiety.  (Doc. 36-3 no. 10)  In short, Billups contends that TSA's denial of her right to FMLA leave forced her to work while disabled, that working while disabled worsened her medical condition, and that she incurred the costs of medical visits and prescriptions as a result of her worsened medical condition.  However, even if Billups's lay opinion is

admissible proof that her working while severely depressed in December, 2005, caused her to incur the medical expenses she enumerates and even if damages resulting from job-related emotional stress are recoverable under the FMLA,[10] Billups's medical expenses were not the direct result of TSA's denial of her FMLA leave.  Billups received all the sick leave she requested.   If she worked while ill because she feared termination, Billups presents no evidence that her fear (even if reasonable) resulted from TSA's interference with her FMLA rights (and she presents some evidence to the contrary[11]). Accordingly, even if TSA committed a "technical violation[] of the FMLA," Drago v. Jenne, 453 F.3d at 1307, by requiring thirty days' notice before Billups's FMLA leave, Billups offers no evidence that she suffered an adverse employment action or a cognizable injury as a result.  Because Billups fails to present evidence on a matter on which she bears the ultimate burden of proof, Celotex, 477 U.S. at 323, TSA is entitled to summary judgment on count one of the complaint, with respect to which no genuine issue of fact remains.

---

[10]   See Johnson v. Georgia Television Co., 435 F.Supp.2d 1237, 1238 (N.D. Ga. 2006) (precluding evidence that the employer's FMLA violation aggravated plaintiff's fibromyalgia: "[T]he recovery Plaintiff seeks is in the nature of consequential damages which may not be recovered in an action under the FMLA."); Dawson v. Leewood Nursing Home, Inc., 14 F. Supp. 2d 828, 833 (E.D. Va. 1998) (no recovery under the FMLA for "medical damages caused by the stress of a FMLA violation"); cf. Nero v. Indus. Molding Corp., 167 F.3d 921, 930 (5th Cir. 1999) ("§ 2617(a)(1) does not provide for recovery of general or consequential damages.").

[11]   See, e.g., Doc. 45 at 39 [154] (Billups discussed her "fear of losing [her] job" with Dr. Thiele on December 1, 2005, that is, before Billups submitted her FMLA leave request); see also Doc. 45 at 30 [118].

II.  The Retaliation Claim[12]

To succeed on an FMLA retaliation claim, "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right.  In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'"  Strickland, 239 F.3d at 1207 (citation omitted).  Even absent direct evidence of the employer's intent to retaliate, the plaintiff states a prima facie case of retaliation by presenting evidence that: (1) he engaged in statutorily protected activity; (2) he experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action.  If the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action.  If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual."  Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006).  "Pretext is only proven if it is shown both that the reason was false, and that discrimination was the real reason behind the challenged action," and the plaintiff's evidence "must reveal such weaknesses, implausibilities, inconsistencies,

---

[12]  Billups attempts to plead count two of the complaint as both an interference claim under 29 U.S.C. § 2615(a)(1) and a retaliation claim under 29 U.S.C. § 2615(a)(2).  However, TSA's motion for summary judgment treats count two as a retaliation claim.  Each count of a complaint should state only a single claim for relief.  See Rule 10(b), Federal Rules of Civil Procedure; Beckwith v. Bellsouth Telecomms., Inc., 146 Fed. Appx. 368, 372 (11th Cir. 2005).

incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." <u>Daugherty v. Mikart, Inc.</u>, 205, Fed. Appx. 826, 827 (11th Cir. 2006).  Finally, "an employer may fire an employee based upon erroneous facts, as long as it is not for a discriminatory reason." <u>Daugherty</u>, 205 Fed. Appx. at 827.

Viewed in the light most favorable to Billups, some evidence tends to show that Billups's complaints about Baker's handling of her FMLA leave requests on December 9, 2005, December 13, 2005, and December 15, 2005, constituted protected activity because Billups had a good faith, reasonable belief that the postponement violated the FMLA.  <u>See</u> 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."); <u>Harper v. Blockbuster Entm't. Corp.</u>, 139 F.3d 1385, 1388 (11th Cir. 1998) ("A plaintiff engages in 'statutorily protected activity' when he or she protests an employer's conduct which is actually lawful, so long as he or she demonstrates 'a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'").[13]  Additionally, Billups engaged in protected activity when she requested and used FMLA-protected leave in January and February, 2005.  Second, Billups's termination was an adverse employment action.  Third, because Baker knew

---

[13]  The Eleventh Circuit Court of Appeals has not decided whether verbal and written complaints to an employer constitute protected activity under the FMLA.  <u>See</u> <u>Drago</u>, 453 F.3d at 1308.

- 23 -

about Billups's protected activity when she fired Billups, the close temporal proximity of

the two,[14] together with other evidence already recounted, suffices to create a genuine

and material issue of causation.[15]

Although TSA presents evidence of a legitimate, non-discriminatory reason for

firing Billlups[16] (namely, because Billups was insubordinate [she yelled at Baker during

_____

[14] Billups (1) complained about Baker's handling of her FMLA request on December 20, 2005, (2) requested FMLA leave on Friday, December 30, 2005, and again on January, 25, 2006, and (3) used FMLA-protected leave on January 25, 2005, and February 10, 2006.  Doc. 63-3; Doc. 46-12 at 4; Doc. 45-7 at 1-2.  Baker fired Billups on February 15, 2006, and the decision to fire Billups occurred even earlier.  See Doc. 41 at 11 [43]) (the decision to fire Billups was made "maybe a couple of weeks before" she was notified of her termination).

[15] See Hurlbert, 439 F.3d at 1298 ("Close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection" unless "there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct . . .") (citation and internal quotation marks omitted); Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection").

[16] Billups argues that TSA waived the right to assert that TSA had a legitimate, non-discriminatory reason for firing Billups because TSA failed to plead this as an affirmative defense.  See Rule 8(c), Federal Rules of Civil Procedure (responsive pleading must include any affirmative defense); Hassan v. U.S. Postal Serv., 842 F.2d 260, 263 (11th Cir. 1988) ("[T]he general rule is that, when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial.").  However, the burden of producing a legitimate reason that devolves upon a defendant once the plaintiff makes a prima facie case of discrimination is in the nature of a denial and not in the nature of a confession and avoidance, i.e., an affirmative defense.  In any event, Billups understood that TSA believed Billups was fired for a legitimate, non-discriminatory reason, and a waiver is disfavored in these circumstances.  Grant v. Preferred Research, Inc., 885 F.2d 795 (11th Cir. 1989); see

(continued...)

the December 15, 2005, and January 18, 2006, meetings], failed to follow the chain of command, and failed to fulfill an important duty in administering TSA's 457 plan), some evidence tends to show that TSA's proffered reasons were pretextual, and that TSA fired Billups because she complained about TSA's handling of her requests for FMLA leave and exercised her right to intermittent FMLA leave.  In addition to the temporal proximity of Billups's protected activity and her termination[17] and the evidence already recounted of Baker's opposition to Billups's FMLA requests, the record includes evidence that tends to show that:

- the testimony of Baker–the person chiefly responsible for Billups's termination[18]–is not credible because (1) Baker lied about why she

_____

[16](...continued)
also Brinkley v. Harbour Recreation Club, 180 F.3d 598, 612 (4th Cir. 1999), abrogation on other grounds recognized by Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F .3d 277 (4th Cir. 2004); Meehan v. East Lyme Bd. of Educ., 1996 WL 629724, *1 (2d Cir. Oct. 31, 1996); Camarillo v. McCarthy, 998 F.2d 638, 639 (9th Cir. 1993).

[17]   See Hurlbert, 439 F.3d at 1298 ("The close temporal proximity between [the plaintiff's] request for leave and his termination-no more than two weeks, under the broadest reading of the facts-is evidence of pretext, though probably insufficient to establish pretext by itself.")

[18]   Saavedra and Farrell concurred in the decision to fire Billups.  However, if viewed in the light most favorable to Billups, some evidence tends to show that they deferred to Baker's recommendation and accepted her reasons but had little independent knowledge about the dispute between Baker and Billups.  Farrell's testimony tends to show he knew nothing about the matter.  He simply agreed with the decision of the others based on what he was told at a meeting.  See Doc. 70 at 14-16, 52-54.  As Farrell put it, he simply "listened and concurred" (Doc. 70 at 54) at the meeting.  At one point Farrell even stated (Doc. 70 at 52), "I was not involved in the decision to terminate [Billlups]."  Although Saavedra knew there was friction between Baker and Billups, some evidence tends to show that he neither knew nor cared about

(continued...)

denied Billups's December 2, 2005, request for FMLA leave,[19] (2) around the time Billups requested and began using FMLA leave, Baker tried to bring about Billups's termination on grounds unrelated to TSA's alleged non-discriminatory reasons for firing Billups,[20] and (3) Baker herself did not believe TSA's proffered reasons for firing Billups.[21]

---

[18](...continued) the rights and wrongs of the dispute and simply agreed with Baker's decision to fire Billups to restore peace among his subordinates.  See, e.g., Doc. 41 at 6 [22] ("Whatever the reasons they didn't get along, it was causing morale issues . . . and something had to be done about that.  So I agreed with Jeannette Baker to fire an at-will employee."); Doc. 41 at 6 [24] ("I did not get involved into who was right on what."); Doc. 41 at 13 [52] ("I'm not involved with what the incidents are between the director of finance and administration and Diane Billups, nor should I expect to be."); Doc. 41 at 10 [40] (Asked to list everything that was wrong with Billups as an employee, Saavedra replied, "I'm not prepared to answer that.  I didn't work with her, I was not her supervisor.  That's something that Jeanette Baker needs to answer. . . ."; Doc. 41 at 16 [63] ("You asked me if [Billups] was ever insubordinate.  She may have been to Ms. Baker.  That's a question you'll have to ask her."); Doc. 41 at 16 [63-64] ("I only had Ms. Baker's side of the story  –  that she had asked Ms. Billups to do a number of things, and they were not done either in the way Ms. Baker wanted them done or just were not done at all.").

[19]  Compare Doc. 38 at 13-14 [49-54] (Baker's testimony that she consulted Chenevert about Billups's FMLA request); Doc. 38-2 at 17 [223] (Baker's testimony that Chenevert told her that requiring thirty days' notice was appropriate in the circumstances) with Doc. 68 at 5-6, 8-9, 15 (Chenevert's testimony that she did not discuss Billups's FMLA request with Baker and was not aware of Billups's FMLA request before her deposition in this lawsuit).

[20]  See Doc. 68 at 5-8 (in January or February, 2006, Baker consulted Chenevert about beginning an investigation into Billups's inappropriate behavior in the workplace); Doc. 38-2 at 30-31 [273-78] (during the Fall of 2005, Baker considered beginning a formal investigation after Billups's made sexually explicit remarks to other employees).

[21]  See, e.g., Doc. 66 (after firing Billups, Baker stated that Billups "was an excellent employee/manager" and "outstanding in all ways").

- Baker believed Billups's FMLA leave would seriously impede TSA's functioning;[22] and

- Baker believed Billups was not entitled to FMLA leave.[23]

In addition to the temporal proximity and the evidence of Baker's hostility to Billups's requests for FMLA leave, this evidence suffices to create triable issues of fact as to causation and pretext and to preclude summary judgment on Billups's retaliation claim.

## CONCLUSION

For the reasons stated, the defendant's motion for summary judgment (Doc. 36) is **GRANTED** as to count one of the complaint and **DENIED** in all other respects.

ORDERED in Tampa, Florida, on November 15, 2007.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[22] See, e.g., Doc. 38-2 at 12 [201] ("[T]he certification said . . . [that Billups's episodes of incapacity] 'can occur for one to five days' . . . 'per occurrence and from zero to four times per month.' You do the math. I mean . . . that could be 20 workdays. And if it was 20 workdays, we would have been in trouble in that one-deep position, because there wasn't anybody there to assist her."); Doc. 38-2 at 19 [229] ("If . . . she had said, 'I'm having an episode. I'm going to be out,' and her episode had lasted four or five days and started immediately again and then gone for the entire month of December, it would have caused great harm to [TSA]."); Doc. 38 at 12 [47-48] ("[Billups] handled workers' comp. What if I had a guy break his leg during the Outback Bowl and there was nobody else to process it. These were employer needs").

[23] See Doc. 36-3 nos. 8, 10 (When Billups submitted her FMLA certification, Baker commented,"you do not look sick"); Doc. 36-3 nos. 8, 10 (Baker insinuated that Billups did not need FMLA medical leave–she "looked great.").